FILED

2006 Jan-26  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

JESSIE MCDANIEL, an individual and
as Administrator of the Estate of ROGER
WAYNE MCDANIEL,

      Plaintiff,

vs.                            CASE NO. CV-04-J-1312-NE

CULLMAN COUNTY, ALABAMA,
et al.,

      Defendants.

### <u>MEMORANDUM OPINION</u>

Pending before the court are the defendants' motions for summary judgment, memoranda and evidentiary submissions (docs. 44-50), to which the plaintiff responded (docs. 51-53, 58) and the individual defendants have filed a memorandum in reply (doc. 61).[1]  Having considered the pleadings, evidence and arguments of the

---

[1]The court has the following pleadings before it relevant to the motions for summary judgment:

    From defendant Cullman County and Cullman County Commission:  Motion for Summary Judgment (doc. 44); Brief in support of Motion for Summary Judgment of Cullman County (doc. 45); Statement of Facts (doc. 46); Affidavit in support of Motion for Summary Judgment (doc. 47); and an amendment to the Statement of Facts (doc. 48).

    From defendants Roden, Buegler and Kee: Motion for Summary Judgment with argument and exhibits attached (doc. 49), and a supplemental evidentiary submission (doc. 50).  These defendants later filed a reply to plaintiff's response (doc. 61).

    From the plaintiff: Response to Cullman County's Undisputed Facts (doc. 51), Opposition to Cullman County's Undisputed Facts (doc. 52); Response in Opposition to Cullman County's Motion for Summary Judgment (doc. 53); Response in Opposition to defendants

parties, the court finds as follows:

## Factual Background

The plaintiff, Jesse McDaniel ("plaintiff") filed suit as an individual and Administrator of the Estate of Roger Wayne McDaniel, deceased. Roger Wayne McDaniel ("McDaniel") was an inmate of the Cullman County Jail on June 24, 2002, the date on which he allegedly committed suicide by hanging himself. Amended complaint, ¶ 14. The defendants assert they did not know nor did they have reason to know McDaniel was suicidal. The plaintiff asserts that the defendants had sufficient information at the time and had they acted reasonably, the death of McDaniel could have been prevented.

McDaniel had been a resident of the Cullman County Jail since June 8, 2002, when he was arrested and charged with Unlawful Possession of a Controlled Substance, Unlawful Possession of Drug Paraphernalia, Reckless Driving, Attempting to Elude, Driving While License Revoked, and a Parole Violation. Buegler affidavit, ¶ 7.[2] He had previously been housed in the Cullman County Jail

Roden, Buegler and Kee's motion for summary judgment (doc. 58). This document contains no legal argument.

[2]Plaintiff sues both "Defendant Warden Buegler" and "Defendant Administrator Buegler" in their individual capacities. Amended complaint, ¶¶ 5, 8-11. The evidence before the court establishes that only one Brian Buegler was sued, and that these two defendants are the same individual. According to Buegler, the Administrator of the Cullman County Jail is another term for "Warden." Buegler affidavit, ¶ 2; Buegler depo. at 7.

as well.  Buegler affidavit, ¶ 8.

McDaniel told another inmate, who was a good friend of his, that he was sick. Hayes depo. at 75-76.  McDaniel was throwing up and was taken to a doctor.  *Id*. at 76-77.  A June 12, 2002, record of a sick call request by plaintiff shows that he thought he was suffering from "DT's."  CCSO-0414, submitted as exhibit to Buegler affidavit; Raley depo. at 8.  An EMT was called for McDaniel.  CCSO-0449, 451; Raley affidavit, ¶ 3.  Early on June 13, 2002, McDaniel was found lying on the floor in front of the showers in the "front bull pen" cell, vomiting.  CCSO-0452; Raley depo. at 17-18.  He was noted to be so sick he could hardly walk.  CCSO-0452.  A fellow inmate, Joshua Lay, stated that McDaniel had unbelievable weight loss, he was weak, he could barely walk, he was constantly vomiting and he was complaining all the time.  Lay depo. at 9-10.

Jailer Elaine Raley, shift supervisor, ordered that an ambulance be called and McDaniel was taken to an emergency room for nausea from drug withdrawal.  CCSO-0420, CCSO-0452; Raley affidavit, ¶ 3; Raley depo. at 11; Westmoreland depo. at 19. Upon return from the emergency room, McDaniel was noted to be still throwing up and he was placed in a cell for observation and given juice, ice and water.  CCSO-0452.  An hour later, he was given Sprite, which he threw up.  CCSO-0453.  An hour after that, a jailer called back to the hospital, which prescribed medication for

McDaniel.  CCSO-0453.

McDaniel was seen later that day by Dr. Henry Beeler.  CCSO-0454; Beeler depo. at 7.  Dr. Beeler examined McDaniel and ordered prescription medication for nausea and other withdrawal symptoms.  Buegler affidavit, ¶ 12; Raley affidavit, ¶ 4; Beeler depo. at 11-12.  In Dr. Beeler's opinion, McDaniel was suffering from withdrawal from crack.  Beeler depo. at 9, 12.  Dr. Beeler did not note any neglect, abuse or depression, and did not find McDaniel to be suicidal, but did not conduct a history for depression or suicidal tendencies.  *Id.*, at 10-11.  He did not believe McDaniel needed hospitalization.  *Id.*, at 10.

On June 14, 2002, McDaniel complained of an upset stomach and was given Sunny Delight.  CCSO-0459.  Jail records reflect that on June 14, 2002, a "lady came to jail office with 1 gallon of Sunny-D and bag of bananas for R. McDaniel.  Lady stated that McDaniel had this problem on the street."  CCSO-0459.  McDaniel was given these provisions, although he refused regular lunch.  CCSO-0459, CCSO-0461.  McDaniel continued to receive medication for nausea each day.  CCSO-0460.  However, he was informed on June 17, 2002, that he would have to eat the same food as the other inmates and would no longer receive a special diet.  CCSO-0470.

Based on instructions from Buegler, McDaniel was moved to the receiving cell for medical observation.  Exhibit 2 to Buegler depo.; CCSO-0404.  McDaniel became

abusive and combative and did not comply with jailers' instructions until another jailer displayed his Taser unit to McDaniel. CCSO-0404. Because of his behavior, McDaniel was removed from the receiving cell, where there were other inmates, to the second floor temporary holding cell, where he would be alone. Exhibit 2 to Buegler depo. Buegler thereafter contacted mental health for a consult on McDaniel. CCSO-0404; Buegler depo. at 14-16.

On June 18, 2002, the plaintiff was seen by a Licensed Professional Counselor, Keith Murner. Buegler affidavit, ¶ 14; Keith Murner depo. at 7, 10. Upon screening, Murner found McDaniel to be logical and coherent, did not think McDaniel was a danger to himself, but did note that McDaniel might benefit from medical care due to a possible ulceration of his esophagus. Exhibit 1 to Buegler depo.; Murner depo. at 28-29, 31, 33. Murner also noted a possibility of depression related to the overdose deaths of his ex-wife and 14 year old daughter.[3] Exhibit 1 to Buegler depo.; Murner depo. at 14. Additionally, Murner stated that anyone coming off drugs like McDaniel would be depressed. Murner depo. at 14-15. However, Murner did not believe that McDaniel needed further mental health treatment, because what he observed was

_____

[3]A friend of McDaniel's, Brandon Hayes, related that McDaniel said he was depressed in January 2002 due to the death of his daughter from an overdose and the death of his ex-wife. Hayes depo. at 63-65. However, Hayes also stated that "Roger never really seemed depressed. I mean he was always up, happy, ready to go." *Id.*, at 66. When Hayes became incarcerated with McDaniel at the jail, McDaniel never mentioned anything about killing himself to Hayes. *Id.*, at 88-89.

chemically related and any depression was situational regarding the potential for going to prison.[4]  *Id*., at 19-21, 32.

On June 19, 2002, McDaniel was seen by a jail nurse due to vomiting.  CCSO-0421, 0422, 0476.  He was given medication and water and stopped vomiting.  CCSO-0421.  McDaniel again requested to see a nurse on June 21, 2002 for vomiting.  CCSO-0421.  However, the jail records shows that jailers reported that McDaniel had behavior problems and that Buegler said he would speak with McDaniel.[5]  CCSO-0421.  Other inmates were angry with McDaniel for laying in the shower and using up all of the ice water from the water cooler.  CCSO-0486.  He was told to stop both activities.  He asked to be moved to another cell, which was denied, but his request to see the nurse was granted.  CCSO-0486.

The defendants allege that, because McDaniel was unpleasant to the other inmates at the jail, early in the morning on June 23, 2002, he was removed from general population and placed in another cell called the downstairs receiving cell.  CCSO-0492; Raley affidavit, ¶¶ 5,7.  He did not appear to be sick at that time.  Raley

---

[4]According to Murner, withdrawal symptoms from crystal meth may last for two to three weeks.  Murner depo. at 22.  There is no medical treatment for detoxing people from crystal meth.  *Id*.  Side effects would include nausea, muscle cramps, irritablility, depression and agitation.  *Id*., at 23-24.

[5]For example, on June 20, 2002, McDaniel did not want to get his dinner plate.  He was told if he did not get up and get it, he would not get fed.  CCSO-0480.  That same day, he did not want to change his sheets and was told he had to do so.  CCSO-0481.

affidavit, ¶ 9.  That afternoon, banging was heard coming from that cell.  A jailer went to check, and McDaniel said he was sick.  He was informed that the doctor said he could have a regular diet.  CCSO-0494; exhibit 1 to Kee depo.[6]  Because of further banging, Jailers Clay and Kee went to the cell and were told by another inmate to get McDaniel out of that cell and that McDaniel was trying to throw up.  Kee depo. at 39-40.  Kee observed McDaniel sticking his fingers down his throat.  *Id*., at 40.  McDaniel insisted he needed Sunny Delight.  *Id*.

The officers told McDaniel to get on his knees, and started to handcuff him.  CCSO-0494; Kee depo. at 44.  McDaniel jumped to his feet and drew his arm back at Kee.  Kee depo. at 44.  Therefore, McDaniel was "taken down to the floor" and restrained with assistance from Clay.  CCSO-0494; Kee depo. at 45; exhibit 1 to Kee depo.  Kee reported that when they were on the floor, he applied pressure to McDaniel's neck and pulled McDaniel toward him, while Clay grabbed McDaniel's hands and got them in handcuffs.  Defendant exhibit O, ABI Interview with Kee.  Kee stated that one of his knees was on the back of McDaniel's head and the other was in McDaniel's back, to prevent further struggle.  *Id*.  At that point, McDaniel was taken back to the second floor holding cell, and placed by himself because he was disrupting the other inmates.  CCSO-0494; Raley affidavit, ¶ 9; Kee depo. at 45-47.

---

[6]John Kee is a weekend jailer at the Cullman County Jail.  Kee depo. at 8

7

According to Buegler, this was for McDaniel's protection.  Buegler affidavit, ¶¶ 16-17.

Once McDaniel was placed in the upstairs cell, he did not seem sick.  Kee depo. at 49.  Rather, he seemed to be trying to get attention.[7]  *Id*.  When Kee performed a jail check less than an hour later, McDaniel was sitting in the cell and apologized to Kee for his behavior.  *Id*., at 56.

The plaintiff asserts that McDaniel was moved to the second floor holding cell because he was on suicide watch.  *See* declaration of David Marsh, plaintiff's exhibit 4.  This cell, called the "hole," was used for suicide watch inmates, as well as for disorderly inmates, segregation, and a variety of other purposes.  Hayes depo. at 71-72, 87; Buegler depo. at 59-60, 69; Roden depo. at 58; Westmoreland depo. at 26.  On June 24, 2002, at 1:13 a.m., McDaniel was found having hanged himself by trustee Brian Waters, who was sleeping in the hallway outside that cell. CCSO-0496; Raley affidavit, ¶ 11; Roden depo. at 79; Westmoreland depo. at 40.   Despite resuscitation efforts, McDaniel was pronounced dead upon his arrival at Woodland Hospital.   The cell where McDaniel was housed had no surveillance, no officer stationed nearby, and no intercom. Westmoreland depo. at 41-42.

---

[7]Brian Waters, a jail trustee, stated he was sure McDaniel killed himself, but thought he did not mean to do it and was only trying to get sympathy.  Defendants' exhibit O, Interview with Brian Waters.

Defendant Roden learned of McDaniel's death from a late night phone call from the jail. Roden depo. at 40. He contacted the Alabama Bureau of Investigations ("ABI") to investigate McDaniel's death. *Id.*, at 43.

The plaintiff asserts numerous and often conflicting facts, most of which are not supported by any evidence. In his wrongful death claim, the plaintiff alleges that defendant Cullman County Commission ("Cullman County") was aware of the risk of suicide to jail inmates, but took no actions to construct a proper jail facility, provide adequate medical staff, or provide a jail cell for inmates on suicide watch.[8] Amended complaint, ¶¶ 21-23, 25. The plaintiff alleges that defendants Sheriff Tyler Roden and Warden Brian Buegler failed to properly train and supervise jailers

---

[8]Many of the plaintiff's pleadings raise allegations of jail overcrowding and issues of whether the defendant Cullman County was aware of overcrowding at the Cullman County Jail. However, missing from any pleading submitted by the plaintiff is any allegation that the plaintiff was harmed by overcrowding. For example, the plaintiff asserts that "many inmates were not in lockdown and allowed to sleep on cots outside the locked cells in the hallways and common areas and wonder (sic) around the second floor of the jail facility at all times of the day and night and had an opportunity to either hang or assist in the hanging/death of inmate McDaniel." Amended complaint, ¶ 26. As the plaintiff does not dispute that McDaniel was in a locked cell by himself, the court finds no relevance in the allegations of inmates wandering around outside cells. *See e.g.*, Kee depo. at 82. Should the court accept plaintiff's postulation that other inmates somehow reached through the cell bars and assisted McDaniel in hanging himself or just hanged him, then the court would have to disregard plaintiff's arguments concerning whether the defendants were negligent in not preventing McDaniel's suicide. The plaintiff also insists that McDaniel did not commit suicide, but was killed by the jailers and then hung to look like he killed himself. Plaintiff depo. at 163-166, 178. Of course, when asked about this scenario, the testimony of Emily Ward, forensic pathologist, was that the plaintiff's speculation about McDaniel being hung by someone else and being made to look like a suicide was not supportable by the autopsy findings, regardless of the plaintiff's physical condition before death. Ward depo. at 41-42.

regarding suicide watch.  *Id.,* ¶ 24.  The plaintiff also asserts that McDaniel was suicidal, placed on suicide watch, and placed in a cell with no water, no jailers nearby, and no intercom system.  *Id*.

McDaniel never voiced that he was suicidal to any jail personnel, nor did any other inmates report to jail personnel that McDaniel made any comments about committing suicide.  Raley affidavit, ¶ 16.  Another inmate, who befriended McDaniel in jail, stated in deposition that he never heard McDaniel say he intended to take his own life.  Lay depo. at 19, 52-53, 56.  However, in his statement to the ABI, Lay said he heard McDaniel say he was going to kill himself two weeks earlier, but Lay did not believe him.  Defendants' exhibit O, interview with Joshua Lay.  Another inmate, Keith Willingham, heard McDaniel state that he was going to kill himself, but did not report it because he thought McDaniel was kidding.  Defendants' Exhibit O, Interview with Keith Willingham.

The plaintiff also asserts that the defendants "inflicted physical injury by beating and chocking (sic), and withholding medical treatment, which proximately caused the death of...McDaniel." Amended complaint, ¶¶ 30-32.  This claim seems to be directed towards defendant Kee, an officer at the jail accused of coming to the cell where McDaniel was confined on June 24, 2002, and "slamm[ing] [McDaniel] against the confining bars and the cell floor because he was too weak to respond in

the manner Defendant Key (sic) instructed ... Defendant Key (sic) placed handcuffs on Roger McDaniel tight and began to beat and kick him about the head and body. Defendant Key (sic) soon thereafter choked him as he carried him upstairs .... Roger Wayne McDaniel was placed on suicide watch ... with no bedding or shirt and soon thereafter was found hanging from a pillowcase by a trustee later that night."[9] Amended complaint ¶ 14. Kee testified that McDaniel was not injured in any way when he was moved from the downstairs cell to the upstairs holding cell. Kee depo. at 75-76. Kee also stated that McDaniel had a shirt on at some point during the night. Kee depo. at 79.

According to Buegler, when he went to the cell after McDaniel's body was removed, he observed "blankets, things of that stuff, things like that." Buegler depo. at 54. The cell did not have a sink or a bed in it. Buegler depo. at 56; Roden depo. at 59. Kee did not give McDaniel a bed, blanket, pillow or sheets. Kee depo. at 61. However, he thinks Sergeant Clay provided McDaniel with a blanket. *Id.*, at 62. Kee finished his shift and left the jail around midnight. *Id.* Deputy Westmoreland agrees that McDaniel obtained a pillow, but does not know how he got it. Westmoreland

---

[9]Many of these allegations seem to come from the declaration of William A. Myers, submitted as plaintiff's exhibit 3. Interestingly, Mr. Myers' name does not appear on any of the lists of inmates in the Cullman County Jail on June 23-25, 2002. *See* Exhibit 3 to Buegler depo.; CCSO-0349; Roden depo. at 76-77 (stating the lists are accurate). *See also* Lay depo. at 59-61, 65 (asserting he heard a scuffle and hollering coming from the "hole").

depo. at 29.  When Westmoreland first saw McDaniel that evening, McDaniel was lying on the floor with a blanket.  *Id.*, at 31.  When he checked fifteen minutes later, McDaniel also had a pillow, without a pillowcase, but he did not observe any sheets. *Id.*, at 35-36, 39.  When Westmoreland made his rounds at 12:55 a.m., McDaniel was lying on the floor and appeared to be asleep.  *Id.*, at 38, 58-59.  After being notified that McDaniel had hanged himself, Westmoreland responded and saw McDaniel hanging from a pillowcase.  *Id.*, at 45.  He and trustee Waters cut McDaniel down, laid him on the floor, and waited for the EMTs to arrive.  *Id.*, at 47-48, CCSO-0225.

The plaintiff also states claims under 42 U.S.C. § 1983 for cruel and unusual punishment and for policies and customs of "gross negligently and inadequately supervise and train ...." which violated McDaniel's rights under the Eighth Amendment to the United States Constitution.  Amended complaint, ¶¶ 35-36, 40, 54.

McDaniel told other inmates that he was going to kill himself.   However, no evidence that these other inmates relayed this information to the jailers or other defendants has been produced.  The parties dispute whether McDaniel was moved because he was placed on suicide watch, or moved because of concern the other inmates would harm him.  The plaintiff asserts he was told by Roden and other inmates that McDaniel was on suicide watch.  Plaintiff depo. at 44-45, 154, 174.

According to defendant Roden, McDaniel was not on suicide watch at the time of his death because jail personnel had no reason to place McDaniel on suicide watch or under close observation.[10]  Affidavit of Roden, ¶8; Roden depo. at 67.  *See also* affidavit of Raley, ¶ 19.  Kee stated that he had no knowledge that McDaniel might harm himself or others.  Kee depo. at 71.  Westmoreland never heard McDaniel state any intention of harming or killing himself.  Westmoreland depo. at 60.

According to the ABI report, McDaniel died as a result of suicide by hanging and there was no indication of foul play.  Roden depo. at 73.  The Alabama Department of Forensic Sciences received McDaniel's body on June 24, 2002.  Depo. of Emily Ward, Forensic Pathologist, at 9. According to the autopsy report, McDaniel had an abraded ligature mark circling his neck, but no other bruising or injury around the mark.  Ward depo. at 12.  No evidence was found that McDaniel died from a beating.  *Id.*, at 13.  Rather, he died from suicidal hanging.  *Id.*, at 14; exhibit 2 to Ward depo.  Had someone else hanged McDaniel, evidence of the same would have appeared at the autopsy.  Ward depo. at 15-19, 36-38.  Additionally, based on the report, Ward concluded that McDaniel died rapidly.  *Id.*, at 20, 30-31, 54.

---

[10]According to several jailers, if an inmate was placed on suicide watch, he or she had to be checked on every fifteen minutes, would have a trustee assigned to watch them 24 hours a day and a separate log would be maintained on the inmate, to show checks every fifteen minutes.  See e.g., Westmoreland depo. at 59-61.  Additionally, such an inmate would be stripped naked and not given a blanket or pillow.  *Id.*, at 61.

13

Interviews conducted by ABI with EMTs, other medical personnel, and deputies who reported to the jail after McDaniel was found all reflect that no bruises or bleeding was seen on McDaniel's body beyond the marks on his neck. Defendants' exhibit O, Interviews with Robyn C. Hall, Cynthia J. Hamel, Angela C. Johnson, Michael B. Johnson, David Michael McCormick, and Stanley Edwin Pendergrass. Because defendant Kee was not at the jail when McDaniel died, he did not have a lot of information regarding the circumstances of McDaniel's death. Kee depo. at 35.

The plaintiff claims he was either given or took pictures showing that McDaniel suffered a beating. Plaintiff depo. at 53-54, 58-60, 66. However, such pictures have not been submitted as evidence to the court. The plaintiff was told by other inmates at the jail that McDaniel was beaten while downstairs and dragged upstairs by his feet by deputies, but also that Officer Kee choked McDaniel "as he carried him up the stairs to the extent that his feet were not touching the stairs," then hung in the upstairs cell by deputies. *Id.,* at 115, 123, 128, 130, 153-154. Plaintiff believes that the deputy sheriffs, and not other inmates, hanged McDaniel.[11] *Id.,* at

---

[11]Interestingly, plaintiff argues in his opposition to defendants Roden, Beugler and Kee's motion for summary judgment that "[t]he statements of Jesse McDaniel is (sic) also inadmissible as speculation and not proper for an undisputed fact (sic) for a determination of a summary judgment." Plaintiff's opposition (doc. 58) at 5-6. Apparently, the plaintiff does not believe his own deposition testimony and requests the court ignore it, as it conflicts with the plaintiff's theory of injury contained in his own pleadings.

14

156-157.  The plaintiff agrees that each of these inmates were in the downstairs cell and could not have seen what occurred upstairs.  *Id.*, at 129-131.

The plaintiff also disputes that an autopsy was performed on McDaniel by the Alabama Department of Forensic Sciences.  Plaintiff depo. at 61-62, 69.  He believes the autopsy report is false because he does not think the marks on McDaniel's neck are where they should be if he died by hanging.  *Id.*, at 163-165.  He is convinced that McDaniel was beaten to death and then hung after he was already dead.  *Id.*, at 164-165, 206-207, 217.  The plaintiff does not contend that McDaniel committed suicide.  *Id.*, at 217-218.

### Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no

> genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322-23.  The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of  genuine issues of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro. 56(e).  In meeting this burden the nonmoving party must demonstrate that there is a "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); Fed.R.Civ.P. 56(c).

"A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir.2000), quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).  A factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment. *Brown v. American Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir.1991).

**Legal Analysis**

**Defendant Sheriff Roden in his individual capacity, and Deliberate Indifference**

Defendant Roden alleges that, under the Eighth Amendment to the United States Constitution, he was not deliberately indifferent to McDaniel's needs, as required for plaintiff to get past qualified immunity.   No evidence exists that defendant Roden made any decisions regarding the medical treatment provided to McDaniel, or the cell assignments made for McDaniel.  While the plaintiff sets forth various theories of liability in his amended complaint, the plaintiff wholly fails to provide any legal argument to the court in his response to these defendants' motion for summary judgment.   The court therefore finds this claim abandoned by the plaintiff.  *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.,* 325 F.3d 1274, 1284 (11th Cir.2003); *see also Wilkerson v. Grinnell Corp.,* 270 F.3d 1314, 1322 (11th Cir.2001).

Even if the plaintiff had argued this claim in his response to the defendants' motion, mere negligence in diagnosing or treating a medical condition is an insufficient basis for grounding liability on a claim of medical mistreatment under the Eighth Amendment." *Adams v. Poag,* 61 F.3d 1537, 1543, (11th Cir. 1995) (quoting *Estelle v. Gambel,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976)). Rather, as stated above, the plaintiff must establish deliberate indifference on the part of the government official.  The analysis of a claim of deliberate indifference to a

17

prisoner's serious medical needs has two components: whether evidence of a serious medical need exists; if so, whether the defendants' response to that need amounted to deliberate indifference. *See Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir.1989).  See also *Carswell v. Bay County*, 854 F.2d 454, 457 (11th Cir.1988); *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 704 (11th Cir.1985) (stating the standard as requiring knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference).  Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference. *Poag*, 61 F.3d at 1544 (quoting *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986)).

Assuming evidence of a serious medical need existed, there is no evidence that Roden's response was inadequate, as he did not know of the need.  Additionally, there is no evidence that the jailers response was inadequate, as the record demonstrates repeated medical care.  Furthermore, the plaintiff has not provided the court any evidence that additional medical care would have prevented McDaniel from committing suicide.  Without such proximate cause, the issue of the medical care received by McDaniel prior to his death is not relevant.

A sheriff cannot be held liable on a theory of respondeat superior, rather the plaintiff must establish that the Sheriff himself was deliberately indifferent. *See Cook*

*ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla*., 402 F.3d 1092, 1115 (11th Cir.2005); *Hardin v. Hayes,* 957 F.2d 845, 849 (11th Cir.1992).  For § 1983 liability, the plaintiff must show a causal connection between actions of the supervising official and the alleged constitutional deprivation. *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990).  The plaintiff wholly fails to provide any evidence of a causal connection between Roden's actions and McDaniel's death.  Sheriff Roden does not remember whether he ever saw McDaniel during his June 2002 incarceration.  Roden depo. at 74.

The plaintiff's arguments concerning jail overcrowding have no logical relationship to McDaniel committing suicide while locked in a cell by himself. Furthermore, such arguments do not address nor rebut Roden's argument that he has no liability under the Eighth Amendment under the set of facts before the court.  The court shall grant summary judgment on the plaintiff's 42 U.S.C. § 1983 claim against Roden under the Eighth Amendment.

**Defendants Roden and Buegler in their individual capacities, and Failure to Train**

To prevail on a failure to train claim, the plaintiff must show that defendants Roden and/or Buegler  were on notice that their training of jail personnel regarding medical care of prisoners and monitoring of suicidal prisoners was somehow

deficient.  *See e.g., Gaines v. Choctaw County Commission*, 242 F.Supp.2d 1153, 1164-1165 (S.D.Ala.2003).  Without such allegations, plaintiff cannot prevail on his supervisory liability claim.[12]  All of the jailers who were asked stated that the jail had a suicide policy, which included frequent cell checks and placement of the prisoner in question in the cell with no items at all.[13]  Additionally, because the plaintiff has failed to provide any evidence that the defendants knew or should have known that McDaniel was suicidal, the suicide watch policy is irrelevant.  Because the plaintiff has not presented evidence that McDaniel's suicide was attributable to any alleged failures in training or supervision, the court shall grant summary judgment on these claims.

**Defendants Buegler and Kee in their individual capacities, and deliberate indifference**

As with the claims against Roden, the plaintiff must set forth facts that demonstrate defendants Buegler and Kee were deliberately indifferent to the needs of McDaniel.  If there is no deliberate indifference, there can be no violation of a constitutional right and hence no § 1983 liability.  *See e.g., Marsh v. Butler County*,

---

[12]Although the amended complaint seems to state this claim against defendant Cullman County as well as Roden and Buegler, no such claim exists under the law.

[13]Whether or not the suicide policy is written is not a relevant consideration for this court. *See e.g., Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1397 (11th Cir.1994) (stating that a sheriff who had an unwritten policy that "made an effort to identify and protect potentially suicidal inmates from self-harm" was not guilty of deliberate indifference).

268 F.3d 1014, 1022 (11th Cir.2001).  Defendant Buegler arranged for medical care for McDaniel and had him moved from one cell to another because other inmates were threatening McDaniel with harm.  In his response to the defendants' motion for summary judgment, the plaintiff fails to address and makes no argument as to how Buegler's actions fell to a level of deliberate indifference.   Similarly, the plaintiff fails to mention any action or inaction by defendant Kee which related to McDaniel's demise.

The only mention of defendant Kee by plaintiff has to do with allegations that Kee beat and choked McDaniel.[14]  Although such allegations are not supported by substantial evidence, even if true, they are unrelated to plaintiff's claim that McDaniel's suicide was due to, *inter alia*, defendant Kee "while acting under color of law, for exhibiting and intentional, deliberate, and/or callous indifference to a known risk confronting Roger Wayne McDaniel such as to create a situation in which the Defendants' malicious, sadistic, unnecessary, unwarranted , and severely punitive conduct towards Plaintiff, so as to constitute cruel and unusual punishment (sic)."  Amended complaint, ¶ 35.

Under § 1983, in a prisoner suicide case, the plaintiff must show that jail

---

[14]The amended complaint contains allegations that the defendants failed to adequately supervise and train the staff, including defendant Kee.  *See e.g.,* amended complaint, ¶ 40.  However, this does not allege a cause of action against defendant Kee.

officials displayed deliberate indifference to the prisoner's taking of his own life. *Snow v. City of Citronelle*, 420 F.3d 1262, 1268 (11th Cir.2005) (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir.2005). The plaintiff must show that the defendant had (1) subjective knowledge of a risk of serious harm; and (2) disregarded that risk; (3) by conduct that is more than mere negligence. *Snow*, 420 F.3d at 1268. "The mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners .... An officer 'cannot be liable under [section] 1983 for the suicide of a prisoner who never had threatened or attempted suicide and who had never been considered a suicide risk." *Snow*, 420 F.3d at 1268-69; citing *Cook*, 402 F.3d at 1116. As stated above, the plaintiff has failed to present any evidence that defendants Kee, Buegler, or Roden had subjective knowledge of a strong likelihood that McDaniel would attempt to commit suicide.[15] McDaniel's comments to other inmates, who never shared the information with jail employees, are insufficient to establish subjective knowledge by these defendants.

---

[15]Evidence of other suicides at the jail is irrelevant. "Under controlling case precedent, § 1983 requires that the defendant have 'notice of the suicidal tendency of *the* individual whose rights are at issue in order to be held liable for the suicide of that individual.' *Tittle v. Jefferson County Comm'n,* 10 F.3d 1535, 1539 (11th Cir.1994) (*en banc* ) (emphasis in original). Other suicides occurring in the [jail] are in no way probative of the Sheriff's knowledge of *Tessier's* suicidal tendencies." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1105 (11th Cir.2005).

Under this Circuit's precedent, in a prison suicide case, deliberate indifference requires that the defendant deliberately disregard "a *strong likelihood* rather than a mere possibility that the self-infliction of harm will occur." [*Cagle v. Sutherland,* 334 F.3d 980, 986 (11th Cir.2003)] (emphasis in original) (quoting *Popham v. City of Talladega,* 908 F.2d 1561, 1563 (11th Cir.1990)). "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." *Id.* (quoting *Tittle,* 10 F.3d at 1540).

*Cook*, 402 F.3d at 1115.

In consideration of the foregoing, the court shall grant summary judgment on the plaintiff's 42 U.S.C. § 1983 claim against defendants Buegler and Kee under the Eighth Amendment.

**Defendant Cullman County/Cullman County Commission**

In the amended complaint, the plaintiff brings claims against defendant Cullman County for violation of McDaniel's rights under 42 U.S.C. § 1983 for developing or maintaining policies exhibiting a deliberate indifference to the rights of McDaniel by (1) failing to properly supervise, manage and train correctional officers; (2) failing to enforce the laws of Alabama and the United States; (3) inadequate procedures and policies; (4) failing to fund and provide training and protection for suicidal inmates; and (5) failing to take measures to improve conditions at the jail.[16]

---

[16]The plaintiff offers no explanation or support for his claims of "failing to enforce the laws of Alabama and the United States" and "inadequate procedures." As such the court finds

The plaintiff offers scant evidence in support of any of these theories of liability.  Rather, the plaintiff argues that the County is liable for McDaniel's death because it "had no security monitors or anything up there if he was put on suicide watch or — and all of the others.  They're supposed to have cameras or some kind of monitors showing that they was; right?"  Plaintiff depo. at 186.  The plaintiff then confirms that he is not claiming that McDaniel committed suicide.  *Id.*  The plaintiff also contends that the County Commission should have directed jail personnel to be upstairs when McDaniel was put in the upstairs cell.  *Id.*, at 187-188.

**Failure to Properly Supervise, Manage and Train**

The County does not control the deputies at the jail.  It does not supervise, manage and train correctional officers.  Clearly established law states that a County does not have the duty or authority to control the daily operations of a jail or the supervision of inmates.  *Turquitt v. Jefferson County, Alabama*, 137 F.3d 1285, 1289 (11th Cir.1998).

**Failure to Fund, Provide Training and Protection for Suicidal Inmates**

Defendant County alleges it paid whatever amounts were necessary for the operation of the jail, regardless of the fact that the amounts significantly exceeded the budget each year.  Brief and argument of Cullman County (doc. 45), at 4.  The County

---

these claims abandoned.

is not liable under § 1983 for the failure to fund medical care for inmates, because it did provide adequate funding to the jail.  It paid the amounts required for the jail, regardless of the fact that the jail exceeded its budget for the years 1999-2002.  *See* affidavit of Commissioner Wiley Kitchens (doc. 47); deposition of Commissioner Norman Tucker, at 76-77.  The   plaintiff has presented no evidence that the Commission did not pay whatever amounts were requested for the jail, including medical care.

The plaintiff also argues that there was no funding for training officers on how to handle inmates who may be suicidal and that there was no audio or video surveillance of the cell where McDaniel was held.  Plaintiff's undisputed facts (doc. 52), at ¶¶ 10- 11.  The plaintiff offers no explanation of how such funding could have prevented McDaniel's injuries, nor how the failure to provide such funding constituted deliberate indifference to McDaniel's constitutional rights.  As noted above, various jailers testified to suicide watch procedures.   The plaintiff has produced no evidence that further training would have prevented McDaniel's suicide.

**Failure to Improve Jail Conditions**

The plaintiff has pointed to no specific county policy regarding the erection, maintenance of the jail which allegedly contributed or caused McDaniel's death.  *See Marsh v. Butler County*, 268 F.3d 1014, 1027 (11th Cir. 2001).  Rather, the plaintiff argues that a lawsuit filed in 2000 against defendant County, concerning structural problems with the jail, reflects the County's awareness of overcrowding at the Cullman County Jail.  Plaintiff's undisputed facts (doc. 52), at ¶¶ 2-9; plaintiff's brief and argument (doc. 53) at 3-4.  As the court already noted, the plaintiff makes no allegations that overcrowding contributed to McDaniel's injuries or death.  As such, all arguments concerning jail overcrowding are simply irrelevant to the facts before this court.[17]

Accepting plaintiff's allegations of the deficiencies in the Cullman County Jail during 2002 as true, the plaintiff makes no argument as to how McDaniel was harmed by such deficiencies.  The plaintiff alleges that "[t]he inaction of the Cullman County Commission was the proximate cause of the death of Roger McDaniel whether he committed suicide or was killed by the hands of another.  At least it met the level of

---

[17]The court found, pursuant to separate opinion, that the 2000 lawsuit, which culminated in a consent decree entered after the facts relevant to this case occurred, has no bearing on the issues before this court.  *See e.g., Cagle v. Sutherland*, 334 F.3d 980, 986-987 (11th Cir.2003) ("Because [a consent decree] cannot create or expand constitutional rights, a section 1983 claim cannot be based solely on a violation of the order").

26

deliberate indifference (sic)." Plaintiff's brief and argument (doc. 53) at 9. This argument is wholly unsupported by any evidence before the court. Additionally, the court can find no legal basis by which the County can be liable for the self-inflicted harm of the plaintiff. Even if the court was to accept the plaintiff's theory that McDaniel was beaten to death by deputies, whether or not the jail was overcrowded or had video equipment is irrelevant. Therefore, this claim is due to be dismissed and summary judgment granted in favor of the County.

**Wrongful Death**

The plaintiff also alleges that the County Commission's deliberate indifference to the dangerous conditions in the Cullman County Jail makes the County liable based on a state law wrongful death theory. Plaintiff brief and argument (doc. 53) at 9-10. The plaintiff asserts that because he contends that McDaniel did not commit suicide, this is a disputed and material fact which requires summary judgment to be denied. Plaintiff misses the basic premise of summary judgment in which the plaintiff must put forth evidence creating a genuine issue of material fact. The only evidence before the court concerning the plaintiff's cause of death is the autopsy report and the deposition of Emily Ward. This evidence supports a factual conclusion of suicide. The plaintiff cannot create a genuine issue of material fact by pointing out minor inconsistencies in various individual's testimony, none of which refute or call in to

question the finding that McDaniel committed suicide.  See e.g., *Brown v. American Honda Motor Co.*, 939 F.2d at 953.

The plaintiff fails to provide any evidence that further funding by the County would have prevented McDaniel's suicide.  The plaintiff has presented no evidence that the County engaged in any negligent act or failure to act which in any way impacted the events at the jail at the specific time in question.  *See* § 6-5-410, Alabama Code 1975, as amended (requiring a "wrongful act, omission, or negligence" for wrongful death liability to attach).  Therefore, the court shall grant summary judgment on the plaintiff's claim for wrongful death against defendant Cullman County.

## Conclusion

The court having considered the foregoing, and being of the opinion that summary judgment is due to be granted in favor of the defendants and against the plaintiff on all counts of the complaint, the court shall so rule by separate Order.

**DONE** this the 26th day of January, 2006.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE